UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHARLES HOOVER and LEEANN D. HOOVER | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No. 06-1301 |
| | ) | |
| ABF FREIGHT SYSTEM, INC., | ) | |
| Defendant | ) | |

**ORDER**

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the Court is the Defendant's Motion for Partial Summary Judgment. The motion is fully briefed and I have carefully considered the arguments and evidence submitted. For the following reason, the motion [#19] is granted.

**JURISDICTION**

Plaintiffs allege that Defendant, ABF Freight System Inc. [hereinafter ABF], a trucking company, damaged their household and business goods when transporting them from Florida to Illinois in January of 2005. This damage, according to Plaintiffs, was in breach of their contract with ABF. Plaintiffs filed suit in state court, seeking damages in excess of $50,000. Defendant removed the case to this court pursuant to 28 U.S.C. §1337, 1441, and 1445.

District Courts have original jurisdiction of any civil action arising under any Act of Congress regulating commerce. 28 U.S.C. 1337(a). This statutory section provides that an action brought pursuant to 49 U.S.C. 14706, which is the basis for this litigation, fall within that original jurisdiction so long as the amount in controversy for each bill of lading exceeds $10,000 exclusive

of interest and costs. Plaintiffs in the case before this Court seek damages in the amount of $51,695.60. Accordingly this Court has jurisdiction over the subject matter of this dispute.

## SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1016 (7th Cir.2000); Cox v. Acme Health Serv., 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, Erdman v. City of Ft. Atkinson, 84 F.3d 960, 961 (7th Cir. 1996); Vukadinovich v. Bd. of Sch. Trustees, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir. 1990); DeValk Lincoln-Mercury, Inc. V. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987); Bartman v. Allis Chalmers Corp., 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092

(1987), and construing any doubts against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Trotter v. Anderson, 417 F.2d 1191 (7th Cir. 1969); Haefling v. United Parcel Serv., Inc., 169 F.3d 494, 497 (7th Cir.1999).

The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 532 (7th Cir.1999). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., Jordan v. Summers, 205 F.3d 337, 342 (7th Cir.2000).

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995), citing Anderson, 477 U.S. at 248. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

## UNDISPUTED FACTS

The following statement of undisputed facts is taken from the parties' statements and responses thereto. It is noted that Plaintiff's response and sur-reply contain "denials" of factual matters that were not stated by Defendant as undisputed facts. Those denials are therefore disregarded.

ABF is a motor carrier. The Plaintiffs were moving from Vero Beach, Florida to Pekin, Illinois. After doing some internet research, they selected ABF as their preferred carrier to move their household goods and some tools and equipment from a family-owned business. ABF's billing structure is based on the linear feet used in the trailer, not on the weight of the goods being shipped. According to the Hoovers, this was the primary reason they selected ABF, as opposed to a regular moving company, as their carrier.

ABF offers several different methods of moving; the method selected by the Hoovers for their move was called the "U-Pack Program." Under this program, ABF delivers a standard trailer to the customer, who is responsible for packing the goods into the trailer. ABF simply transports the goods to the designated destination, where the customer is responsible for unloading them. Then ABF picks up the empty trailer several days later.

Information from the ABF web site (attached to Leeann Hoover's affidavit) explained the "U-Pack Program," and then explained the availability of insurance as follows:

> ABF offers two types of liability coverage for your goods. The first coverage is catastrophic liability which covers your items at $2.00 per pound per piece, subject to a maximum of $20,000 per trailer for these specific events only: trailer fire, trailer overturn, trailer collision, or complete trailer theft. This standard coverage is included with your quote at no additional charge.
> The second coverage is carrier negligence liability which covers your items at 10 cents per pound per piece for loss or damage cause by carrier negligence. The customer acknowledges that ABF's liability is limited in consideration of a lower rate than would other wise be applicable and that additional coverage is available at a higher price...Additional coverage must be requested through an ABF U-Pack Moving analyst or moving coordinator prior to the actual spot date of your trailer.

Leeann contacted an ABF 800 number and obtained a price quote. At some point before January 3, 2005, she claims to have contacted (by telephone or email: she apparently does not recall which) ABF to confirm that they would be using ABF. She states that she was again informed of

the availability of additional insurance, and she claims to have ordered the additional insurance either by email or by telephone (once again, she does not recall which), selecting the maximum available. She made another call to the 800 number to add an additional ramp at the destination.

ABF delivered a trailer to the Hoover's Florida house on January 3, 2005. According to Leeann, the bill of lading delivered with the empty trailer did not reflect the additional insurance she had ordered. She claims that she called the 800 number shown on the bill of lading and spoke with a customer service representative who told her a corrected bill of lading would be provided when the trailer was picked up for transport.

The Hoovers originally estimated that they would need 12 linear feet. As they packed, they learned they would need more space, ultimately using 28 linear feet. On January 5, Leeann states that she telephoned the 800 number again to notify ABF that they would require a full trailer. She states that she was told the driver would have the correct information when he arrived to pick up the trailer and would telephone the information for a corrected bill of lading.

On January 6, 2005, an ABF driver arrived to pick up the trailer. With him was the same bill of lading the Hoovers had received on January 3, showing that only 12 feet of the trailer was used, and omitting any reference to additional insurance. The "Actual Linear Feet" on the bill of lading was changed from 12 (the computer generated number) to 28 feet (which is handwritten). The bill of lading reflected that $0.00 of optional insurance was included, and the freight charge shown on the document was calculated using the lower rate, which includes only the standard insurance. The Plaintiffs claim that the driver made a telephone call and then told them that the bill of lading would be corrected to include a full trailer and to reflect the additional insurance they had requested.

5

Leeann Hoover signed the bill of lading without making any changes or additions (other than the corrected linear feet mentioned above), and the driver left with the full trailer.

The bill of lading showed the weight of the trailer as 5,375 pounds, which is an estimated weight based on 12 feet. The actual weight of the trailer was substantially more than that. The precise weight is disputed, with the Hoovers claiming that it weighed over 24,000 pounds fully loaded and the Defendant claiming that the average weight for 28 linear feet of household goods is 12,544 pounds. Regardless of the exact weight of the load, Plaintiffs claim that the mis-stated weight led to ABF's placement of the trailer behind a lighter trailer and, according to Plaintiffs, when the semi tractor towing the trailers made a turn, the trailer containing their household goods rolled over 3 times, destroying and damaging the goods on the trailer.

The Hoovers were notified of the rollover incident by telephone call from Ron Meadows, Branch Manager of the ABF terminal in Florida, to Leeann Hoover on January 7, 2005. Meadows asked Leeann to go to the Florida terminal to inspect the damages. She and her husband did so the following day, meeting with James Frazier[1], the supervisor on duty. According to Leeann's affidavit, the trailer was still sealed; it was opened, inspected and photographed. Apparently, the trailer was re-loaded by ABF employees.

On January 12, 2005, the goods were delivered by ABF to the Plaintiffs. The driver began an inspection of the goods, but left and never returned to complete the inspection. Plaintiff's unpacked the truck and put the goods aside for further inspection. Three days later, another driver came to pick up the trailer; he knew nothing about the damage report or an inspection.

---

[1] In her affidavit, Leeann Hoover recites a number of statements allegedly made by Frazier, all of which are clearly immaterial to the issues now before the Court.

On January 24, Leeann called ABF and spoke with Steve Crouse. He told her to complete a claim form. She received a claim form via FAX. Plaintiffs filed their claim via FAX to ABF on January 24[2], 2005. The claim valued the damage at $51,695.60.

Plaintiffs made numerous phone calls to ABF, but were never successful at obtaining any further information about their claim. By September 23, 2005, Plaintiffs had heard nothing from ABF about their claim. A telephone call to headquarters revealed that ABF claimed never to have received the claim. Leeann Hoover faxed a copy of the January 25 claim on September 25, 2005, along with the fax confirmation sheet from the original claim. In October, they were told the claim could not be processed until the Hoovers provided ABF with an estimated weights of the shipped goods. The Hoovers, who had no information about the weight of the trailer, obtained an attorney and filed this litigation.

The documents pertinent to this transaction are as follows. The bill of lading issued by ABF consists of 2 pages. The first page identifies the shipper/consignee, the origin and destination of the shipment, the date of pickup, an estimated transit time of 4-5 working days, and an estimated weight of 5,376 pounds. Beneath that information is a table, as shown below:

> Prelim. Summary for:       Actual Linear                   Driver Init: /I  Tony
> PERSONAL EFFECTS  Feet 28  Customer Init:  /I CH
> Price (based on 12 linear feet trailer space): $1035.00
> Price per Additional Foot: $75.00
> Absolute Minimum Charge: $810.00
> **\*Optional services listed below not included in above price:**

---

[2] The parties differ on the exact date the claim was made, January 24 or January 25. The form is dated January 24, 2005. Plaintiffs claim to have submitted their claim via FAX on January 25, 2005. Neither party has ascribed any significance to the one-day discrepancy. The parties have submitted several different versions of the "claim," but the differences are immaterial to the motion now before the Court.

<u>Standard Liability Coverage:  $0.10/lb per piece  $.0.00</u>              Ramp (Origin) $50.00

(handwritten):  ADD $50.00 FOR XTRA DAY

The table is followed by thirteen numbered paragraphs, which provide in pertinent part:

> 4. LIMITED CARGO LIABILITY:  In exchange for ABF's lower rates, Customer agrees that ABF's liability is limited to the liability coverage shown in the Pricing Summary above and only to the extent of our negligence.  In addition, ABF includes $2.00 per pound per piece with a maximum of $20,000 per trailer for loss or damage caused by trailer fire, vehicle collision, vehicle overturn or complete trailer theft.  ABF does not provide insurance for your goods.  Because you control how your goods are packed and loaded, our liability coverage only applies when ABF is negligent. If additional coverage is purchased, you are purchasing additional liability coverage for our negligence, not insurance for your goods.
>
> 13. APPLICABLE LAW: Customer acknowledges that ABF is a general commodity carrier and that this shipment will be subject only to the laws and regulations governing commodity carriage.  This shipment shall be subject only to Federal laws and statutes.  No state laws or statutes shall apply.

Leeann Hoover's signature appears[3] at the bottom of page 2, dated January 3, 2005. Immediately above the signature section is the following paragraph:

> By signing below, Customer agrees to the terms and conditions herein, the rules and special service charges in ABF 111 series and the terms and conditions in the Uniform Straight bill of lading (UBL) as published in the National Motor Freight Classification in effect on the date of this bill of lading.  To the extent that language contained in this Bill of lading/Price Quote is inconsistent with the rules and special service charges in ABF's 111 series or the terms and conditions of the UBL, the terms and conditions herein shall prevail. Driver signature only acknowledges receipt of freight.

---

[3]Because Leeann's signature appears on this document, no credence is given to her denial that she never saw the bill of lading. (See Plaintiffs' Response, denying ¶ 11 of Defendant's Statement of Undisputed Facts.

The next pertinent document is the Tariff[4] in effect at the time of the Hoover transaction, referred to as ABF 111 series. A copy of the pertinent portions of the 111 series, part 780-1, is attached to the affidavit of Dan Hill, Manager of Cargo Claims for ABF. Part 780-1 is titled "Liability Limitations." Part A provides that ABF "will assume liability for cargo loss and damage claims under the federal laws applicable to common carriage in effect on the date of the shipment and the terms and conditions of the Uniform Straight bill of lading, except as shown herein."

Section 1 provides that ABF's liability is capped unless "otherwise specifically provided." Section 3 provides the cap for "other than new commodities." The cap is "$0.10 per pound per lost or damaged package unless the shipper has requested excess liability coverage" as provided in Section 2. Section 2 instructs that "Shipper may request ABF liability coverage in excess [of the cap] by indicating in writing ... on the bill of lading at the time of shipment the total dollar amount of excess coverage requested."

The next document[5] has no title; it is attached to Leeann Hoover's affidavit as Exhibit 4. This document states that it is the "consignee copy." It consists of three pages. It contains a date of 1/10/05, showing a pickup of 1/6/05, a delivery date of 1/12 (this latter date is handwritten; the other

---

[4] Plaintiffs dispute that this Tariff was part of their contract with ABF because they never saw it and were never given a reasonable opportunity to agree to the limits stated in the Tariff. Whether the Tariff was part of their contract is an issue discussed further below. Certainly, however, the Tariff is material to an understanding of the factual allegations and evidence. It is therefore set forth here.

[5] Although Plaintiff appears to argue that this is the bill of lading, I disagree. The section of the document quoted above refers to the Uniform bill of lading as a separate document. The date of this document is January 12, the date on which the damaged goods were delivered to the Hoovers in Pekin. The Defendant's copy of this document is identical in all respects except for the title: "Delivery Receipt." For each of these reasons, I conclude that this is a delivery receipt, not the bill of lading.

information appears computer generated). The document reflects the 28 linear feet used in the trailer, the extra ramp charge and extra day charge, and the freight shipping charge of $1,798.00. It contains no information at all about additional insurance. Charles Hoover signed this document. On the last page, it shows the weight (5,376) and in all capital letters, surrounded by asterisks, the document states:

> This shipment is subject exclusively to the U Pack Price Schedule, the Uniform bill of lading, the liability limitations and all other applicable provisions of the carrier's individual and collective tariffs, including the ABF-111 Tariff.

## CARMACK AMENDMENT

A motor carrier operating in interstate commerce, such as ABF, is governed by the provisions of the Interstate Commerce Act. What is referred to as the Carmack Amendment to that Act "established a uniform national liability policy for interstate carriers." Hughes Aircraft Co. v. North American Van Lines, Inc., 970 F.2d 609 (9th Cir. 1992). The Carmack Amendment provides that:

> [a] carrier providing transportation ... shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier ... [is] liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by... the delivering carrier."

49 U.S.C. § 14706(a)(1). See, Missouri Pacific R.R.Co. v. Elmore & Stahl, 377 U.S. 134 (1964).

A carrier can, however, limit its liability to the shipper for damage to household goods. The Carmack Amendment also provides that:

> A carrier providing transportation ... may... establish rates for the transportation of property ... under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 14706(c)(2)(A).

In order to effectively limit its liability, a carrier must do four things. First, the carrier must maintain a tariff as required by the ICC. In the tariff, the carrier must list each rate available with terms and conditions for each rate. Among the terms that must be stated in the tariff is the "released rate," which is the maximum dollar liability per unit of weight for which the carrier will be liable if the cargo is damaged. See, Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415 (7th Cir. 1987), cert denied, 485 U.S. 913 (1988).

Second, the carrier must give the shipper a reasonable opportunity to choose to accept the proposed limit on liability. Hughes v. United Van Lines, 829 F.2d at 1415. A "reasonable opportunity" means that the shipper had "both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice." Id., quoting Bio-Lab, Inc. v. Pony Express Courier Corp.U, 911 F.2d 1580, 1582 (11th Cir. 1990). See, Anton v. Greyhound Van Lines Inc., 591 F.2d 103, 108 (1st Cir. 1978).

Third, the carrier must obtain the shipper's written agreement as to his choice of that limit. The agreement must specify the released rate and state that the released rate applies unless the shipper expressly requests additional coverage. Hughes, 829 F.2d at 1415. Obviously, additional coverage increases the rate at which the cargo will be shipped.

Fourth, the carrier must issue a bill of lading prior to moving the shipment that reflects the agreement. See, Hughes, 829 F.2d 1407.

ABF has filed the instant motion for partial summary judgment, arguing that, in the event Plaintiffs establish liability, the damages are limited by the tariff to $10,752. Plaintiffs dispute that the tariff limits liability, submitting affidavits from the Plaintiffs. These affidavits state that Leeann Hoover phoned ABF customer service at the 800 number shown on the bill of lading and told her

that, rather than needing 12 linear feet of the trailer, they would require an entire trailer, namely 28 linear feet. Hoover claims that she was told that the driver would provide the correct information when he picked up the trailer and that he would have a corrected bill of lading. Defendant asserts that the statements in the affidavits are inadmissible by virtue of the parol evidence rule.

## DISCUSSION

The pending motion raises two legal issues: What are the terms of the contract between the Hoovers and ABF? And did ABF properly limit its liability?

The first question entails several sub-issues. Plaintiff's argue that the bill of lading and the tariff do not accurately reflect the terms of the agreement. I reject that argument. Plaintiffs signed the bill of lading, and it clearly incorporates the tariff.

More importantly, however, Plaintiffs assert that those terms may be supplemented by terms they assert were verbally agreed to by ABF. Defendant argues that the bill of lading and tariff state the terms of the entire agreement and may not be supplemented or contradicted by parol evidence.

Whether there is an integrated agreement is to be determined by the court based solely on what is contained within the four corners of the document. J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc., 642 N.E.2d 1215 (Ill.1994). To determine the integration question, the two relevant concerns are whether the writing is the final expression of the agreement and whether it is complete. Id.. Determination of this question must occur prior to application of the parol evidence rule, because the rule has no applicability in documents that are not integrated. Restatement (Second) of Contracts § 209(2). See, Equipose PM LLC v. International Truck and Engine Corp., -- F. Supp. --, Case No.

05C6008, 2006 WL 1594077, *3 at n.2, June 5, 2006 (N.D. Ill.); In re Integrated Agri, Inc., -- F. Supp. 2d --, Case No. 01-84536, 2005 WL 3088612, *5, Nov. 17, 2005 (Bkrtcy. C.D. Ill.) .

In this case, I find that the bill of lading, which incorporates the tariff, constitutes an integrated agreement. All necessary terms are included: dates, pricing, and agreement of both parties. Because it is integrated, the parol evidence rule governs.

Under the parol evidence rule[6], any evidence of prior or contemporaneous agreements is not admissible to alter or contradict the terms of an otherwise unambiguous written contract. Bublitz v. Wilkins Buick, Mazda, Suzuki, Inc., 881 N.E.2d 375, 381 (Ill.App. 2007); W.W. Vincent & Co. v. First Colony Life Ins. Co., 814 N.E.2d 960, 966 (Ill.App.2004) Vuagniaux v. Korte, 652 N.E.2d 840 (Ill.App.1995). See also, Lillien v. Peak6 Investments, L.P., 417 F.3d 667, 670 (7th Cir.2005); Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc., 212 F.3d 373, 380 (7th Cir.2000).

Only if a contract is ambiguous as to an issue in dispute may extrinsic evidence be used to discover the genuine intent of the parties. First American Commercial Bancorp v. Interior Architects, Inc., -- F. Supp. 2d --, Case No. 03-00638, 2004 WL 2011398, at *9-10, Aug 31, 2004 (N.D. Ill.). When a contract dispute arises and one party seeks to admit representations of negotiations which are not embodied in the contract, the parol evidence rule bars that evidence from being considered by the court. Vigortone Ag Prods. v. AG Prods., 316 F.3d 641, 644 (7th Cir.2002).

---

[6]Because the admissibility of extrinsic evidence to prove the meaning of written contracts-governed by the "parol evidence rule"-is an issue of substantive contract law, it is governed in this case by the law of Illinois. See, AM International, Inc. v. Graphic Mgmt. Assoc., Inc., 44 F.3d 572, 576 (7th Cir.1995) (stating that the parol evidence rule is a substantive rule of law); see also, Bank of Naperville v. Holz, 407 N.E.2d 1102, 1106 (Ill.App.1980).

Unilateral statements cannot vary the effect of a contract that bears both sides' signatures. While the parol evidence rule sometimes allows a contract to be viewed in the light of objective evidence from third parties or both sides' negotiators, see Pierce v. Atchison, Topeka & Santa Fe Ry., 65 F.3d 562, 568 (7th Cir.1995), it does not give effect to self-serving and unilateral declarations by one party to a contract or that party's lawyer. Baker v. Potter, -- F.3d --, Case No. 05-2095, 2005 WL 2850767, *1, Oct. 24, 2005 (7th Cir.). The parol evidence rule bars the introduction of the most questionable form of extrinsic evidence-self-serving testimony by one of the parties as to what the parties "really" agreed to in the negotiations leading up to the signing of the contract. Regency Commercial Associates, LLC v. Lopax, Inc., 869 N.E.2d 310, 326-327 (Ill.App. 2007), quoting R. Posner, *The Law and Economics of Contract Interpretation,* 83 Tex. L.Rev. 1581, 1600 (2005).

I find no ambiguity with respect to insurance coverage within the four corners of the bill of lading (and the incorporated tariff). The bill of lading unambiguously states that no additional insurance coverage is purchased. The bill of lading was signed by Leeann Hoover, who did not make any notation about insurance on the bill of lading, although she did assure that the number of linear feet was properly shown. There is no documentation at all other than Leeann's unilateral statements to support her claim of additional insurance. To give credence to those statements would certainly violate the parol evidence rule by contradicting a term set forth in the written document. Leeann Hoover's statements regarding the purchase of additional insurance cannot be considered in determining the liability of the defendant.

I further find that each element of the four-part test has been met, so ABF's liability was limited to the released rate shown in the bill of lading and tariff.

The first element requires that a tariff be properly maintained - there is no dispute about this - and that the tariff state each rate available with terms and conditions for each rate, including the "released rate." The tariff in effect at the time of the Hoovers' move states in some detail the various rates. It also explains how the shipper can obtain additional liability coverage: by "writing ... on the bill of lading, at time of shipment the total dollar amount of excess coverage requested." The tariff states the cost of additional coverage. I find that this satisfies the first requirement for a carrier to limit its liability.

The second element requires the carrier to have given the shipper both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice. ABF gave the Hoovers a reasonable opportunity to accept or reject the proposed cap on liability. The Hoovers were indisputably aware of the liability limitation; Leeann signed the bill of lading. There is no admissible evidence suggesting that ABF did anything to prevent them from obtaining information about their options or about the tariff. The bill of lading clearly states the liability cap and references the availability of additional insurance. The web site and all pertinent documents provide both notice and opportunity. I conclude that the second element was also met.

Third, ABF obtained the Hoovers' written agreement as to the limit. The bill of lading specified the released rate and stated that the released rate applied unless the shipper expressly requested additional coverage. The bill of lading clearly states that "$0.00" in optional additional insurance was purchased, and Leeann signed the bill of lading.

Fourth, the carrier must issue a bill of lading prior to moving the shipment that reflects the agreement. In the absence of any documentation of a request for additional insurance, I find that the

bill of lading issued by ABF for their shipment of the Hoovers' goods reflected the agreement between the parties.

As a result, I conclude that ABF properly limited its liability as stated in the bill of lading and incorporated tariff.

## CONCLUSION

For all the reasons stated above, the Defendant's motion for partial summary judgment [#19] is granted.  This case is set for a Final pretrial conference on May 2, 2008 at 1:30 p.m. in person in chambers and a bench trial on May 28, 2008 at 9:00 a.m.

ENTERED ON  April 18, 2008

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE